## PABST BREWING COMPANY *v.* CRENSHAW.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

No. 85. Argued December 8, 1904.—Decided April 17, 1905.

The malt liquor inspection law of Missouri provides for the inspection of malt liquors manufactured within the State and also for those manufactured without and held for sale and consumption within the State. The Supreme Court of the State sustained the law deciding among other things that the act does not affect liquors shipped into the State and held there for reshipment without the State, that it does not discriminate in favor of beer manufactured in the State, and that it is not a revenue, but an inspection law. The constitutionality of the law was attacked

by a manufacturer of malt liquors without the State as an interference with interstate commerce, and also on the ground that as the amount of the inspection charge far exceeds the expense of inspection it is a revenue, and not an inspection law, and therefore does not fall under permissive provisions of the Wilson Act. *Held:*

A state statute which operates upon beer and malt liquors shipped from other States after their arrival and while held for sale and consumption within the State, is not an interference with interstate commerce in view of the provisions of the Wilson Act.

The regulation of the sale of liquor is essentially a police power of the State, and a provision in a state law, tending to determine the purity of malt liquors sold in the State, is an exercise of the same power.

The purpose of the Wilson Act is to make liquor, after its arrival in a State, a domestic product, and to confer power on the States to deal with it accordingly. The police power is, hence, to be measured by the right of the State to control or regulate domestic products and this creates a state and not a Federal question as respects the commerce clause of the Constitution; and this court cannot review the determination of the state court that the statute involved in this case was not a revenue but an inspection measure.

A state regulation, valid under the Wilson Act, as to liquors shipped from another State after delivery at destination is not an interference with interstate commerce because it affects traffic in, and deters shipments of, the article into that State.

The rule that state inspection laws, which do not provide adequate inspection and impose a burden beyond the cost of inspection, are repugnant to the commerce clause of the Constitution does not apply to liquors after they have ceased to be articles of interstate commerce under the provisions of the Wilson Act.

THE facts are stated in the opinion.

*Mr. Clifford Histed,* with whom *Mr. James H. Harkless, Mr. Charles S. Crysler* and *Mr. Francis C. Downey* were on the brief, for appellant:

The business is interstate commerce. *United States* v. *Swift & Co.,* 122 Fed. Rep. 529; *Schollenberger* v. *Pennsylvania,* 171 U. S. 1; *Robbins* v. *Taxing District,* 120 U. S. 489; *Stockard* v. *Morgan,* 185 U. S. 27; *New York* v. *Roberts,* 171 U. S. 658. *Brewing Co.* v. *Brister,* 179 U. S. 445, distinguished.

The statute is not within the police power of the State.

The fees bear no just relation to the expense. The fees do not go to the inspectors but to the State which separately appropriates for the inspectors' salaries. The receipts are

$350,000 and the expenses about $12,500. It was introduced and regarded as a revenue measure, and afterwards disguised as an inspection law. House Journal, Missouri Legislation, 1899, 190, 278, 452; Sen. Journal, 386, 610, 620; Session Acts, 1901, 226. The act does not regulate the sale of beer. As to being subject to inspection fees, malt liquors stand on the same footing as other merchandise under the commerce clause of the Constitution. *License Cases*, 5 How. 599; *Bowman* v. *Chicago Ry. Co.*, 125 U. S. 465, and cases cited; *Leisy* v. *Hardin*, 135 U. S. 100, 110; *Scott* v. *Donald*, 165 U. S. 58, 91.

As intoxicating liquors are subjects of lawful commerce in Missouri, the State, in imposing an inspection fee under its police power, is bound by the rule that the charge bears a reasonable and just relation to the cost of inspection. *Hopkins* v. *United States*, 171 U. S. 578, 597; *Express Co.* v. *Ohio*, 166 U. S. 185, 218; *W. U. Tel. Co.* v. *New Hope*, 187 U. S. 419; *Telegraph Co.* v. *Philadelphia*, 190 U. S. 160; *Postal Tel. Co.* v. *New Hope*, 192 U. S. 55; *Postal Tel. Co.* v. *Taylor*, 192 U. S. 64.

No practical inspection is punished by the act, nor under it have the inspectors any power to make an actual inspection. The statute cannot be sustained as a police regulation because, in its practical workings, it has no relation whatever to the public health. *Vance* v. *Vandercook Co.*, 170 U. S. 438, 456; *Mugler* v. *Kansas*, 123 U. S. 623, 661; *Scott* v. *Donald*, 165 U. S. 93; *Reid* v. *Colorado*, 187 U. S. 150.

This court is not bound by the declaration of the state Supreme Court that the act is an inspection law. This court will determine that for itself, as interstate commerce is involved. *Brennan* v. *Titusville*, 153 U. S. 289; *Postal Tel. Co.* v. *Taylor*, 192 U. S. 64; *People* v. *Compagnie Générale*, 107 U. S. 59, 63; *Minnesota* v. *Barber*, 136 U. S. 313.

The tax is not authorized by the Wilson Law. The act is an unreasonable burden on interstate commerce and is not within the police power as it is a pure revenue measure and does not come within the provisions of the Wilson Bill. The Missouri state court held that it did come within the provisions of that

act, State v.. Bixman, 162 Missouri, 38, but that. decision cannot be sustained by the cases cited. See Brewing Co. v. Brister, 179 U. S. 445, 455; Brewing Co. v. Terre Haute, 98 Fed. Rep. 330; Ex parte Jervey, 66 Fed. Rep. 957; Re Bergen, 115 Fed. Rep. 339; Brewing Co. v. McGilivray, 104 Fed. Rep. 258.

Mr. Edward C. Crow, Attorney General of the State of Missouri, and Mr. William M. Williams for appellee: ·

The Supreme Court of the State has held the law to be constitutional, and it. is not open to appellant to question its validity upon the ground of any supposed conflict with the state constitution. State v. Bixman, 162. Missouri, 1.

This court will follow the highest court of the State in questions involving the construction of the state constitution.

The only question here is whether the act violates the Federal Constitution; in determining that, the Federal courts will adopt the construction given to· the statute by the Supreme Court of the State. Cargill Co. v. Minnesota, 180 U. S. 452.

The "Wilson Bill" puts intoxicating liquors shipped into a State within the police power of such· State immediately upon their arrival. Such liquors do not stand upon the same footing as other articles of interstate commerce, and authorities touching the latter are inapplicable, since the passage of said bill, to the former. The State may prescribe the terms and conditions upon which such liquors may be sold, even in original packages, and, in the absence of discrimination against the products of other States, such regulations are valid. Vance v. Vandercook Co., 170 U. S. 438; Brewing Co. v. Brister, 179 U. S. 445.

The act is a police measure, is a valid exercise of the police power of the State, and comes within the express terms of the "Wilson Bill.". ·11 Am. & Eng. Ency. of Law, 1st ed:, 592; Black on Intox. Liq. § 55; Kurth v. State, 86 Tennessee, 134; McGahey v. Virginia, 135 U. S. 662; State v. Hudson, 78 Missouri, 365.

It cannot be that this is not a tax upon the privilege or business on the ground that the right to engage in the business

is given by another statute. It was still within the power of the legislature to impose additional conditions and burdens upon the privilege of carrying on the business. It is not necessary that all the regulations of the liquor traffic should be contained in one statute. *State* v. *Luddington,* 33 Wisconsin, 107; *Kurth* v. *State,* 86 Tennessee, 134.

Complainant, after the passage of this act, was not authorized to sell beer by virtue of a license granted to it under other statutes, unless it also complied with the requirements of this law.

The right to manufacture and sell intoxicating liquors is not a natural right and may be granted or withheld by the legislature. Cases cited *supra;* Black, § 39; *Austin* v. *State,* 10 Missouri, 591; *State* v. *Bixman,* 162 Missouri, 1. The legislature may impose what conditions it sees fit. *Boston Beer Co.* v. *Massachusetts,* 97 U. S. 25; *Danville* v. *Hatcher,* 44 S. E. Rep. 723; *Tragresser* v. *Gray,* 9 L. R. A. 780; *Ex parte Sikes,* 24 L. R. A. 774; Cooley on Taxation, 2d ed., 587.

If appellant's contention, that under the guise of an inspection law, the state statute simply imposes a specific tax upon beer for general revenue purposes, was correct, still there is nothing in the interstate commerce clause of the Federal Constitution to prevent such tax. *Hinson* v. *Lott,* 8 Wall. 148; *Am. Steel Co.* v. *Speed,* 192 U. S. 500; *Carstairs* v. *Cochran,* 193 U. S. 10.

MR. JUSTICE WHITE delivered the opinion of the court.

The Pabst Brewing Company, a Wisconsin corporation, filed its bill in the court below to enjoin the beer inspector of the State of Missouri and his assistant from collecting or attempting to collect an inspection charge, fee, license or burden, which it was alleged the law of Missouri imposed upon beer or other malt liquors when shipped from other States into Missouri, after its delivery within that State to the consignee, and when held for sale for consumption in Missouri or for shipment to other States. The general ground upon which the law was

assailed was that the exactions complained of were regulations
of commerce repugnant to the Constitution of the United
States. It was in addition specially averred that so far as
the law imposed a charge on beer shipped from Wisconsin into
Missouri, and held there by the consignee for sale and shipment
for consumption in other States, the Missouri law was repug-
nant to the commerce clause, because in this particular it
discriminated in favor of beer manufactured in Missouri and
held for sale or shipment for consumption in other States.

The bill was amended and demurred to. Whilst the court
considered the law not to be in conflict with the commerce
clause on the general grounds alleged, it nevertheless concluded,
because of the averment concerning discrimination as to beer
shipped into Missouri for reshipment to other States, that the
demurrer could not be sustained. 120 Fed. Rep. 144. An
answer was thereupon filed, as also a replication, and subse-
quently the cause was submitted upon the pleadings and an
agreed statement of facts.

The Supreme Court of Missouri having decided that the law
in question did not provide for any charge or burden upon beer
or other malt liquors shipped into Missouri and held there for
reshipment to points outside of the State, the court below,
adhering to its previous opinion as to the general averments
of the bill, and applying the construction given by the Supreme
Court of the State to the statute, held that it did not discrimi-
nate, and dismissed the suit.

The law of Missouri in question is entitled "An act creating
the office of inspector of beer and malt liquors of the State,
and providing for the inspection of beer and malt liquors
manufactured and sold in this State." The provisions of the
act essential to be considered may be summarized as follows:

It creates the office of beer inspector, to be appointed by
the Governor, who shall be an expert beer brewer, and who is
required to furnish a bond, and is given power to appoint the
necessary deputies to execute the provisions of the act. The
act forbids every person or corporation engaged in brewing

within the State from using any material or chemical in the manufacture of beer or other malt liquors other than pure hops or pure extract of hops, or barley, malt, or wholesome yeast or rice. It is provided that the inspector or his deputies shall keep a record of those engaged in the manufacture, brewing and sale of malt liquors within the State and of the quantity manufactured or sold, 'and shall make a full report to the Governor concerning the same, and imposes upon the officials named the duty of inspecting all beer or other malt liquors manufactured or sold within the State, to see that they conform to the standard of purity which the law requires. The act further imposes an inspection fee, charge or license, accompanied with provisions for a label or stamp to be affixed upon the packages containing the beer or other malt liquors so manufactured or offered for sale within the State.

Concerning beer or other malt liquors manufactured outside of the State of Missouri and shipped into that State for sale and consumption within the State, after delivery and receipt under the shipment, the act provides as follows:

"SEC. 5. Every person, persons or corporation who shall receive for sale or offer for sale any beer or other malt liquors other than those manufactured in this State shall, upon receipt of same, and before offering for sale, notify the inspector, who shall be furnished with a sworn affidavit, subscribed by an officer authorized to administer oaths, from the manufacturer thereof, or other reputable person having actual knowledge of the composition of said beer or other malt liquors, that no material other than pure hops or the extract of hops, or pure barley, malt or wholesome yeast, or rice, was used in the manufacture of same; upon the receipt of said affidavit the inspector shall inspect and label the packages containing said beer or malt liquors, for which services he shall receive like fees as those imposed upon the manufacturers of beer and malt liquors in this State."

In the printed and oral argument at bar all the contentions concerning discrimination are waived, and the sole ground

relied upon is the assertion that the statute constitutes a regulation of commerce and is hence repugnant to the commerce clause of the Constitution of the United States.

Brevity and clearness in the consideration of the propositions relied upon to sustain the contentions made will be subserved by fixing at the outset exactly what the statute does and by stating the legal principles which are controlling.

The subject with which the statute deals is beer and other malt liquors. Plainly, it operates upon such liquors only when manufactured in the State or if shipped from other States, after their arrival in the State and when they are held there for sale and consumption therein.

It is provided by the act of Congress, commonly styled the Wilson Act, 26 Stat. 313, c. 728, as follows:

"That all fermented, distilled, or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

The scope of this act and the power of Congress to adopt it were passed upon in *In re Rahrer*, 140 U. S. 545. The scope of the act was thus stated (p. 560):

"Congress has now spoken and declared that imported liquors or liquids shall, upon arrival in a State, fall within the category of domestic articles of a similar nature."

It was decided that although the act had the effect thus stated it was not repugnant to the Constitution of the United States, the court saying (p. 562):

"No reason is perceived why, if Congress chooses to provide that certain designated subjects of interstate commerce shall be governed by a rule which divests them of that character at

an earlier period of time than would otherwise be the case, it is not within its competency to do so."

In *Rhodes* v. *Iowa*, 170 U. S. 412, the purport of the act was again passed upon. Reiterating the ruling made in the *Rahrer case*, it was decided that whilst the Wilson Act caused liquors shipped into Iowa from another State to be divested of their character as articles of interstate commerce after their delivery in Iowa to the person to whom consigned, nevertheless the act did not authorize the laws of Iowa to be applied to such merchandise whilst in transit from another State and before delivery in Iowa.

In *Vance* v. *Vandercook Co., No. 1*, 170 U. S. 438, the operation of a liquor law of South Carolina was considered. By the act in question the State of South Carolina took exclusive charge of the sale of liquor within the State, appointed its agents to sell the same, and empowered them to purchase the liquor, which was to be brought into the State for sale. The fact was that by the act in question the State of South Carolina, instead of forbidding the traffic in liquor, authorized it, and engaged in the liquor business for its own account, using it as a source of revenue. The act in addition affixed prerequisite conditions to the shipment into South Carolina from other States of liquor to a consumer who had purchased it for his own use and not for sale. Considering the Wilson Act and the previous decisions applying it, it was decided that the South Carolina law, in so far as it took charge in behalf of the State of the sale of liquor within the State and made such sale a source of revenue, was not an interference with interstate commerce. In so far, however, as the state law imposed burdens on the right to ship liquor from another State to a resident of South Carolina intended for his own use and not for sale within the State, the law was held to be repugnant to the Constitution, because the Wilson Act, whilst it delegated to the State plenary power to regulate the sale of liquors in South Carolina shipped into the State from other States, did not recognize the right of a State to prevent an individual

from ordering liquors from outside of the State of his residence for his own consumption and not for sale.

Quite recently, at this term, in *American Express Company* v. *Iowa*, and *Adams Express Co.* v. *Iowa*, 196 U. S. 133, 147, the construction affixed to the Wilson Act in the previous cases was applied, and the power of the State of Iowa to control the sale of liquors shipped from another State into that State, after their delivery to the consignee, was upheld.

Applying the Wilson Act and the decisions thereunder to the statute here assailed, we think it clear that the contention that it is repugnant to the commerce clause of the Constitution is without merit, unless the reasons urged to show that the present case is not within the scope of the Wilson Act be well founded. We proceed to consider the contentions relied on to establish that proposition.

1st. The Wilson Act, it is argued, subjects liquors shipped from one State into another, after their arrival at their destination, only to the "laws of such State or Territory enacted in the exercise of its police powers . . ." As, it is said, the law of Missouri was not enacted in the exercise of the police power, hence malt liquor received from another State and held in Missouri for sale retained its character as an article of interstate commerce until sold in the original package.

But the proposition rests upon the mere assumption that the law of Missouri was not enacted in the exercise of the police power of that State. Certainly the regulation of the sale of liquor is essentially a police power. Surely, also, provision made in a state law tending to determine the purity of malt liquors offered for sale and consumption within a State is likewise an exertion of the same power. Conceding that the law in question may be inadequate to accomplish the purpose designed and produces a large revenue to the State over and above the cost of inspection, this affords no Federal ground upon which to hold that the police power of the State was not brought into play in making the enactment where the law does not operate upon a subject within Federal control. This

becomes evident when it is borne in mind that, whether the statute be regarded as a prohibition, as a regulation, as a license or as an inspection law, if it encroached upon the Federal authority it would be void, and, on the contrary, in all or any of these aspects, the law would be valid, so far as the Federal Constitution is concerned, if it did not so encroach. The purpose of the Wilson Act was to make liquor after its arrival a domestic product and to confer power upon the States to deal with it accordingly. The police power is hence to be measured by the right of a State to control or regulate domestic products, a state and not a Federal question as respects the commerce clause of the Constitution. So far as the state aspect is concerned the matter is foreclosed by a decision of the Supreme Court of Missouri passing upon the validity, under the state constitution, of the law now under consideration: *State* v. *Bixman*, 162 Missouri, 1. In that case a person was proceeded against for selling malt liquor made within the State of Missouri without complying with the statute. The validity of the statute was assailed, on the ground, among others, that it was a revenue law and repugnant to the uniformity clause of the state constitution; that it was not an inspection law because it did not provide for an adequate inspection, and because the burden which it imposed was obviously out of all proportion to the cost of inspection, since the charge which was exacted copiously enriched the state treasury. The state court, after an elaborate review of its previous decisions, held that the mere fact that a revenue was produced by the execution of the statute did not cause the statute to be merely a revenue measure, and that although the inspection which the law provided might be inadequate, nevertheless the statute did not violate the state constitution. These views were sustained upon the ground that the statute dealt with a subject which was peculiarly within the police power of the State. Summing up its conclusions as to the validity of the statute, the court declared:

"In our opinion, it [the law] *is a police regulation, imposing*

*conditions upon the business of manufacturing and selling beer
and malt liquors in this State,* which business the State may
absolutely suppress, or permit upon such terms as the legis-
lature may prescribe. We construe the act in view of all its
parts, and in connection with other license laws of this State,
and hold that the fee exacted is the price which the State de-
mands for the privilege of doing the business of brewing and
selling beer and malt liquors in this State, and it is immaterial
by what name it is called."

As then, the Supreme Court of Missouri has determined
that the statute does not conflict with the state constitution
and is valid because it is a police regulation imposing condi-
tions upon the business of manufacturing and selling beer in
Missouri, a traffic which it is conceded the State had the power
to prohibit entirely, it follows that we are without power, from
a consideration of the state constitution, to treat the law as
invalid because of the revenue provisions of the state constitu-
tion or other limitations imposed by that constitution upon
the state government. It necessarily results from this that
the assailed law comes directly within the express terms of
the Wilson Act. The determination of this question by the
Supreme Court of Missouri, as to liquor manufactured in
Missouri, in the absence of discrimination, is necessarily con-
clusive also as to the character of the law when applied to a
similar article shipped from other States into Missouri after
arrival at its destination, and when held for sale and con-
sumption in that State. This must be the case, since, as we
have seen, the Wilson Act, to use the words of *In re Rahrer,*
places liquor coming from another State after its arrival
"within the category of domestic articles of a similar nature."

To decide that an exertion by a State of its power to regu-
late the sale of malt liquors manufactured within the State
was an exercise of its police authority, and yet to say that the
same, when applied to liquor shipped into the State from other
States, after delivery, was not an exertion of the police power,
would be to destroy the Wilson Act, and frustrate the very

object which it was intended to accomplish, and besides would overrule the previous decisions of this court upholding and enforcing that statute.

We need not, however, further consider the subject, since the proposition relied upon is not open to discussion, as a similar contention was expressly ruled upon in *Vance* v. *Vandercook Co., No. 1, supra.* In that case, as has already been said, the State of South Carolina had by law taken charge of the sale of liquors in the various counties of the State, no liquor being allowed to be sold except through the state agencies. The law by which this system was put in force had been upheld by the state courts as a lawful exertion of the police power. The validity of the act was assailed in the Circuit Court of the United States on the ground of its repugnancy to the commerce clause of the Constitution, and the lower court sustained the contention. Among the grounds relied upon in this court was that the law in question was not within the Wilson Act, because it was not an exertion of the police power of the State, since it did not forbid the sale of liquor, but on the contrary fostered and encouraged it and made it a source of revenue. In holding this proposition to be untenable the court said (p. 447):

"The confusion of thought which is involved in the proposition to which we have just referred is embodied in the principle upon which the court below mainly rested its conclusion. That is, 'if all alcoholic liquors, by whomsoever held, are declared contraband, they cease to belong to commerce, and are within the jurisdiction of the police power; but so long as their manufacture, purchase or sale, and their use as a beverage in any form or by any person are recognized, they belong to commerce and are without the domain of the police power.' But this restricts the police power to the mere right to forbid, and denies any and all authority to regulate or restrict. The manifest purpose of the act of Congress was to subject original packages to the regulations and restraints imposed by the state law. If the purpose of the act had been to allow the

state law to govern the sale of the original package only where the sales of all liquor were forbidden, this object could have found ready expression, whilst, on the contrary, the entire context of the act manifests the purpose of Congress to give to the respective States full legislative authority, both for the purpose of prohibition as well as for that of regulation and restriction with reference to the sale in original packages of intoxicating liquors brought in from other States.''

2d. Conceding, it is argued, that the Missouri statute attached to the liquor after delivery at its destination in Missouri, nevertheless as the burdens which the statute imposed were of such a character as to affect traffic in the article and hence operate to deter shipments into Missouri, therefore the statute must be treated as if it bore upon the liquor while still in transit as a subject of interstate commerce. This proposition simply amounts to contending that the Wilson Act should be disregarded, since to enforce it would give the States power to regulate interstate traffic in liquor. If when a State has but exerted the power lawfully conferred upon it by the act of Congress its action becomes void as an interference with interstate commerce because of the reflex or indirect influence arising from the exercise of the lawful authority, the result would be that a State might exert its power to control or regulate liquor, yet if it did so its action would amount to a regulation of commerce and be void. And this would be but to say at one and the same time that the power could and could not be exercised. But the proposition would have a much more serious result, since to uphold it would overthrow the distinction between direct and indirect burdens upon interstate commerce by means of which the harmonious workings of our constitutional system has been made possible.

3d. It is further insisted that, as the Missouri law is denominated in its text as an inspection law, and does not provide an adequate inspection, and besides imposes a burden beyond the cost of inspection, the law is repugnant to the Constitution of the United States when tested by previous

decisions of this court determining when particular inspection laws amounted to a regulation of commerce, citing *Atlantic & Pacific Telegraph Co.* v. *Philadelphia,* 190 U. S. 160, and *Postal Telegraph-Cable Co.* v. *New Hope,* 192 U. S. 55.　These cases, however, simply considered state laws which operated upon interstate commerce.　To apply them to the Missouri law necessarily involves deciding that the malt liquors to which that law applied had not ceased to be articles of interstate commerce; and, therefore, again, merely disregards the Wilson Act and the decisions of this court concerning it.　Indeed, the whole argument upon which the entire case of the plaintiff in error proceeds rests upon this fallacious assumption, since it admits on the one hand the validity of the Wilson Law, and yet seeks to take this case out of the reach of its provisions by distinctions which have no foundation in reason, unless it be that that law is to be disregarded or held to be unconstitutional.

*Decree affirmed.*

Mr. Justice Brown, with whom the Chief Justice, Mr. Justice Brewer and Mr. Justice Day concurred, dissenting.

The opinion of the court is put upon the ground that the Wilson Act subjects liquors shipped from one State into another, after their arrival at their destination, to the laws of the State or Territory enacted in the exercise of its police powers; and that, as an inspection law is a law enacted in the exercise of its police powers, the law in question is within the act; and we are consequently precluded from inquiring whether such law is a legitimate exercise of the police powers or a mere revenue law to which the name of an inspection law is given for the purpose of obviating the difficulty, under the state constitution, of upholding it as a revenue measure.　It may be conceded at once that if the law in question be a legitimate inspection law it necessarily follows that, as it was enacted in the exercise of the police power of the State, it applies to foreign liquors " to the same extent and in the same manner

as though such liquors or liquids had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced in original packages or otherwise." The opinion practically concedes that the act must, if constitutional, be supported as an inspection law, passed under the police power of the State; and such was the position taken by the Supreme Court of Missouri. It was admitted in that case, both by the majority and minority judges, that the act could not be supported as a revenue measure, because in conflict with the constitution of the State.

To determine the question whether it can be supported as an inspection law it is necessary to consider at some length the nature of its provisions.

The agreed statement of facts shows that the plaintiff manufactures in the State of Wisconsin ten different kinds or grades of beer and malt liquors, each kind being separately manufactured and requiring special treatment; that it ships into the State of Missouri annually not less than 15,000 barrels of malt liquors, of thirty-one gallons each, of the aggregate value of $100,000; that there are a large number of domestic manufacturers of malt liquor in the State of Missouri, whose annual productions amount to over 2,250,000 barrels of beer of the aggregate value of $12,250,000, of which 1,275,000 are sold within the State; that there are other manufacturers outside of the State standing in the same position as the plaintiff, who annually ship into the State not less than 165,000 barrels of the aggregate value of $1,725,000, beside that imported from abroad; that plaintiff is licensed to carry on business in Missouri; that such business consists of shipping into the State, for the purposes of selling therein or reshipping therefrom, the product of its manufacture in Wisconsin; that in the usual course of its business it is compelled to maintain large warehouses in the State, as well as an office, as a necessary adjunct to the conduct of its business; that it maintains no manufactory in Missouri, and that it disposes of its beer in the original packages in which it is shipped.

There are insuperable difficulties in the way of the maintenance of this act as an inspection measure.

To inspect, as defined by Webster, is to examine, to view closely and critically, especially in order to ascertain quality and condition, to detect errors, etc.

The object of the act is declared by section 4 to be to exclude the use of any substance, material or chemical, in the manufacture of malt liquors other than pure hops, or pure extract of hops, or pure barley, malt or wholesome yeast or rice. So far as beer manufactured within the State is concerned, the inspection is made, or at least may be made, *State v. Bixman*, 162 Missouri, 1, 34, of the ingredients of the beer in the mash tub and before the beer is actually brewed. The inspector goes to the brewery and makes his test by taking a sample of the mash of the beer there fermenting, and, although thousands of gallons may be made from one mash, a single inspection is sufficient. With respect to beer manufactured outside of the State, section 5 requires that the consignee of the beer shall notify the inspector, who shall be furnished with a sworn affidavit, subscribed by an officer authorized to administer oaths, from the manufacturer thereof or other reputable person having actual knowledge of the composition of said beer or malt liquors, that no material other than pure hops, or the extract of hops, or pure barley, malt or wholesome yeast or rice, was used in the manufacture of the same. "Upon the receipt of said affidavit the inspector shall inspect and label the packages containing said beer or malt liquors, for which services he shall receive like fees as those imposed upon the manufacturers of beers and malt liquors in this State."

It is true this section seems to require that upon receipt of such affidavit the inspector shall inspect and label the packages. But similar words used in section 7 with regard to domestic beer were interpreted by the Supreme Court in *State v. Bixman*, 162 Missouri, 1, as requiring only an inspection of the mash at the brewery, since the actual inspection of the beer.

would require the opening of each package, or at least a sample
package, which would practically ruin the contents.  As it is
impossible to suppose that the legislature should have con-
templated that the inspectors should visit breweries outside
of the State and inspect the mash, or that they should open
the packages after their receipt in the State, and thus spoil
the beer, it would seem that the inspectors have no alternative
but to accept the affidavit as a basis of their inspection.  This
is said to be the manner in which the law is practically ad-
ministered.  Indeed, the agreed facts show that the beer in-
volved in this case was inspected while still in the hands of
the plaintiff, that the packages were never opened, but the
affidavit was accepted as a sufficient compliance with the act.

While this may be the only inspection practicable, it is
really no inspection at all, since it is dependent entirely upon
the veracity of the person making the affidavit.  There is no
power given to these inspectors to investigate the truth of the
statements contained in these affidavits, except, possibly, by
tasting or analyzing the beer.  There is no penalty provided
for making a false affidavit, nor can the State proceed against
the manufacturer who is beyond the jurisdiction of the court.
There is no assurance that the affidavit, which may be made
in the State of manufacture as well as in Missouri, has any
relation to the particular shipment to which it is sought to
apply it, and there is no power given even to open the boxes
in which bottled liquors purport to be enclosed, to examine
their contents.  The object of inspection laws is to require
such examination of the thing inspected as will insure to the
public a safe and wholesome article.  Obviously to secure this
the inspection must be made by officers appointed for that
purpose; at least it cannot be delegated, as it virtually is in this
case, to the manufacturer.  The requirement of an affidavit,
and the acceptance of this in lieu of an actual inspection, make
the affiant, who is the manufacturer or his agent, the sole judge
of the fact whether the liquor contains only the ingredients
allowed by law.  We cannot treat this as a *bona fide* inspec-

tion. To justify an inspection in law there must be an inspection in fact.

We had occasion in *Vance* v. *Vandercook Co., No. 1,* 170 U. S. 438, 456, to pass upon a law requiring a sample of alcoholic liquor proposed to be shipped, to be sent to the state officer in advance of the shipment, and as a prerequisite to making a subsequent shipment. We held that the inspection of a sample so sent in advance was not in the slightest degree an inspection of the goods subsequently sent into the State. "The sample may be one thing and the merchandise which thereafter comes in another." This is a much stronger case for the application of the principle, as there is no inspection at all, but the acceptance of an affidavit made by an interested party in lieu thereof. Indeed, so perfunctory is this inspection that it appears to have awakened a suspicion in the court below "that the legislature was more concerned in collecting fees to swell the exchequer of the State, than in the protection of the people who might drink beer."

The obvious inefficacy of the inspection has an important bearing upon the more serious objection to this act, in that the fees for inspection bear no just relation to the expense, and make it evident that the law was not passed in a *bona fide* exercise of the police powers of the State, but as a convenient method of increasing the public revenues. Section 8 provides for an inspection fee of one cent per gallon and two cents for labelling each package containing eight gallons, making a total fee of one and a quarter cent per gallon. All of these fees are required to be paid into the state treasury, and pass to the general revenue fund of the State. The inspectors cannot even deduct their salaries from the fees, but are paid by a distinct appropriation for that purpose.

It is conceded in the stipulation of facts that the entire expenditure authorized on account of actual inspection amounts to $12,500, and that the inspection fees annually collected amount to $350,000, or $337,500 in excess of the costs for inspection, and that the fees chargeable under said act upon the

malt liquors manufactured out of and brought into the State from other States and from foreign countries, for sale in Missouri, exceed the total authorized cost for inspection, approximately, $60,000 a year.

In this connection it is pertinent to notice that the bill in question when first introduced in the House was entitled "An act creating the office of inspector of beer and malt liquors, and providing for the creation of a fund for the construction of roads and highways;" and as originally introduced into the Senate contained the words "providing for the increase of the general revenue fund." In the bill as passed these words were stricken out, and the words "providing for the inspection of beers and malt liquors manufactured and sold in this State" inserted in their place. Notw thstanding these changes in the title of the bill as finally passed, it is evident that the main object was to increase the general fund of the State by the amount of the inspection fees, less the expenses of the inspection, and that the inspection was really an incident to or an excuse for the revenue to be derived from the act. These facts are a cogent argument in favor of applying to this case the rule established in a number of recent cases, that fees cannot be imposed for the purpose of inspection upon companies doing an interstate business which are so far in excess of the expenses of such inspection as to make it plain that they were adopted, not as a means of paying such expenses, but as a means of raising revenue.

The latest of these is that of the *Postal Telegraph-Cable Company* v. *Taylor*, 192 U. S. 64, wherein a license fee was imposed upon the telegraph company which largely exceeded the entire cost to the company of maintaining its line, including repairs, reconstruction, costs of labor and of material and travelling expenses of employés, and all expenses incurred by it in a careful inspection of its poles and wires. The ordinance was defended as a police regulation. It was argued that the question of revenue was not its object, but that the defendant had the right to constantly inspect the poles and wires to protect

the lives of its citizens. The court found the borough to have been sparsely settled; that it had done nothing in the way of inspection, and had incurred no liability therefor; that the fee was twenty times as large as was necessary to make the most careful and efficient inspection that could have been made. The ordinance was adjudged to be invalid, the court saying: "To uphold it in such a case as this is to say that it may be passed for one purpose and used for another; passed as a police inspection measure and used for the purpose of raising revenue; that the enactment as a police measure may be used as a mere subterfuge for the purpose of raising revenue, and yet, because it is said to be an inspection measure, the court must take it as such and hold it valid, although resulting in a rate of taxation which, if carried out throughout the country, would bankrupt the company, were it added to the other taxes properly assessed for revenue, and paid by the company."

In previous cases arising under a similar state of facts the ordinances had been upheld as within the police power of the municipality, *St. Louis* v. *Telegraph Co.*, 148 U. S. 92; 149 U. S. 465; *Western Union Tel. Co.* v. *New Hope*, 187 U. S. 419, in which the ordinances were sustained upon the ground that the fees were not so excessive as to justify the inference that they were not imposed as a *bona fide* exercise of the police powers, and in *Atlantic & Pacific Telegraph Co.* v. *Philadelphia*, 190 U. S. 160, in which the question of reasonableness was held to have been properly submitted to the jury, and *Postal Telegraph-Cable Co.* v. *New Hope*, 192 U. S. 55, in which the verdict of a jury for a less amount than that fixed by the ordinance was held to be a verdict that the charge was unreasonable, and should have been followed by a judgment for the telegraph company.

The facts of this case show that the inspection, as applied to malt liquors manufactured out of the State, was purely perfunctory, and accomplished nothing for the protection of its citizens, but that the fee derivable therefrom was thirty times the actual cost of such inspection, even when applied

to liquors manufactured within the State. A disproportion so gross can only be accounted for upon the theory that the act was intended for the purposes of revenue and not for inspection.

It is insisted, however, that as the Supreme Court of the State has in the case of *State* v. *Bixman,* 162 Missouri, 1, by a majority vote, upheld the constitutionality of the act as an inspection law, applied to beer of *domestic* manufacture, and not as an act for raising revenue, we are bound by this definition, and are precluded from considering it in any other light than that of an inspection fee or license tax. But a question of constitutional law cannot be answered by a definition. While, as we have frequently said, we adopt the interpretation of the statute of a State affixed to it by the court of last resort thereof, we still feel at liberty in accepting such interpretation, to determine for ourselves whether the act is a *bona fide* exercise of the police power of the State and not intended merely as an excuse for the taxation of interstate commerce.

As was said by this court in *Mugler* v. *Kansas,* 123 U. S. 623, 661: "If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

In *Railroad Co.* v. *Husen,* 95 U. S. 465, the validity of the act of the State of Missouri, which prohibited the introduction into the State of any Texas or Mexican cattle between the months of March and November of each year, was considered. It was insisted that the law was valid as a quarantine or inspection law, as its purpose was to prevent the introduction of cattle afflicted with contagious diseases. But the court pointed out that no provision was made for the actual inspection of the cattle, so as to secure the rejection of those that were diseased, but that all importation of cattle, whether sound or diseased, was forbidden for long periods; and it was

held that the statute was void as a plain intrusion upon the exclusive domain of Congress.

And in *Reid* v. *Colorado*, 187 U. S. 137, 150, this court said:

"Certain principles are well settled by the former decisions of this court. One is that the purpose of a statute, in whatever language it may be framed, must be determined by its natural and reasonable effect. *Henderson* v. *Mayor of New York*, 92 U. S. 259, 268. Another is that a State may not, by its police regulations, whatever their object, unnecessarily burden foreign or interstate commerce. · *Railroad Company* v. *Husen*, 95 U. S. 465, 472. Again, the acknowledged police powers of a State cannot legitimately be exerted so as to defeat or impair a right secured by the National Constitution, any more than to defeat or impair a statute passed by Congress in pursuance of the powers granted to it. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Missouri, Kansas & Texas Ry. Co.* v. *Haber*, 169 U. S. 613, 625, 626, and authorities cited."

The reasonableness of the law as compared with the cost of inspection is made the test of the validity of the law in *Patapsco Guano Co.* v. *North Carolina Board of Agriculture*, 171 U. S. 345; *Willis* v. *Standard Oil Co.*, 50 Minnesota, 290.

But treating it as an inspection law, the question remains whether, as applied to beer manufactured in other States, it is a *bona fide* exercise of the police powers of the State to protect the health of its citizens, and for the reasons already given we are of opinion it is not. The fact that the law may have been valid as applied to liquors manufactured within the State does not remove the difficulty, as the Wilson Act only applies to the police powers of the State to the same extent and in the same manner as though the liquors had been produced within the State. If foreign liquors were subject to the same inspection as domestic liquors there would be much force in the contention that the inspection was covered by the terms of the Wilson Act; but as in this case domestic liquors were actually inspected, and foreign liquors were not inspected at all, the

act does not apply.   The object of the act is merely to place foreign and domestic liquors on the same footing as respects the police powers of the State.   The inference is drawn in the opinion of the court that upon the arrival of foreign liquors at their destination the State may deal with such liquors as it pleases; in other words, that they have passed wholly beyond the Federal control as subjects of interstate commerce.

The Wilson Act was passed in consequence of our decision in *Leisy* v. *Hardin*, 135 U. S. 100, to the effect that a state statute prohibiting the sale of liquors was unconstitutional, as applied to a sale by the importer from another State in original packages.   That case was put upon the ground that liquors had always been recognized by the commercial world as subjects of exchange, barter and traffic, and that the State could not prohibit their importation from abroad or their sale by the importer.   To meet this exigency, and to enlarge the powers of the State with respect to intoxicating liquors, the Wilson Act was passed, declaring that upon their arrival in the State they should be subject to the police powers of the State to the same extent and in the same manner as though such liquors had been produced within such State.   The constitutionality of this act was sustained in *Rahrer's case*, 140 U. S. 545, although in the subsequent case of *Rhodes* v. *Iowa*, 170 U. S. 412, it was held that the Wilson Act did not operate to attach to liquors the prohibitory legislation of the State at the moment they reached the state line, or before the completion of the act of transportation by their arrival at their point of destination and delivery to the consignee.

The primary, if not the sole, object of the Wilson Act was to attach the prohibitory laws of the State as a police measure to liquors the moment they were delivered to the consignee, although they might still be in their original packages.   The State was then at liberty to forbid their sale.

The act does not affect the right of *inspection*, since that right was one which existed wholly independent of the act,

and had been applied and recognized ever since the case of *City of New York* v. *Miln*, 11 Pet. 102, as one of the ordinary police powers of the State, which it was at liberty to exercise quite irrespective of any Federal statute for the protection of the health of its citizens.  The Wilson Act neither creates, adds to, takes from or affects the police powers of the State with respect to inspection in any particular.  The power of the State to enact inspection laws, provided that such laws are intended in good faith for the protection of the people, and not as a covert means for raising revenue by exorbitant charges, remains precisely as it was before the act was passed.  In the *Miln case* an act of the State of New York, requiring the masters of vessels arriving from foreign ports to report to the city authorities the names, etc., of his passengers, was upheld as a proper exercise of the police power; though subsequently, in the *Passenger Cases*, 7 How. 283, a similar law, requiring the master of vessels to pay a certain sum on account of every passenger brought from a foreign country into the State, was held to be inoperative, although passed under the general denomination of a health law.  It was said that, although the amount of the tax was small, it might have been increased so as to become prohibitory at the discretion of the legislature; and the fact that the tax was applied to the maintenance of a marine hospital, and to the reformation of juvenile delinquents, showed that it could not be sustained as an exercise of the police power.

While we may concede that the liquors in this case had arrived at their destination, it does not follow that they were subject to any law which the State chose to pass in an assumed exercise of the police power.  The State has an undoubted right to inspect all goods arriving therein, but it does not follow that it has the right to subject them to an inspection which is no inspection at all, and charge them with a fee out of all proportion to the costs of even a proper inspection, and call it an exercise of the police power.  Though these liquors had arrived at their destination, the State provided, by section 5

of the act, that they should be inspected before offering them for sale and before they had been commingled with the general mass of property. The fact that they had been delivered to the consignee was of no materiality, since the act which the State required should be done was one which applied a condition precedent to their admission to the State for commercial purposes. Until this act was performed, they were protected against an unlawful interference. This inspection might have taken place at the state line, but for the convenience of the state officers, as well as that of the brewers, it was postponed until the arrival at their destination, as is frequently the case in foreign countries, where imported goods are not examined at the frontier, but at Paris or London, upon their arrival there; but they are not legally entered until such examination takes place. To say that their character as interstate commerce existed at the state line, but had been lost upon their arrival at their place of destination before they had shown themselves entitled to enter the State, is to apply a test wholly irrelevant under the circumstances. Indeed, in the case of *Rhodes* v. *Iowa*, 170 U. S. 412, we held expressly that the prohibitory liquor laws did not apply to liquors while in transit from their point of shipment to their delivery to the consignee. The vital question is whether the inspection was applied at a time prior to their legal importation into the State as a commercial article. If it were, and the inspection were a lawful one, it is a proper regulation of interstate commerce; but if the inspection were not a *bona fide* exercise of the police power it was an unlawful interference with such commerce. Whether the inspection was made at the state line or at the destination of the goods is absolutely immaterial.

The case of *Vance* v. *Vandercook Company, No. 1*, 170 U. S. 438, so strongly relied upon in the opinion of the court, seems to me to have little or no bearing on this feature of this case, and tends rather to support the theory that the Wilson Act had nothing to do with the question of inspection. The case turned upon the power of the consignee of liquors to receive

them for his own use within the State of South Carolina, as well as the power to sell them in the original unbroken packages as imported, to citizens of South Carolina. It was held in substance that the consignee had the constitutional right to receive them for his own use without regard to the state laws, but that under the Wilson Act he could no longer assert a right to *sell* them in original packages in defiance of the state laws. It was said that although the state law permitted the sale of liquors subject to particular restrictions and upon certain enumerated conditions, it did not follow that the law was not a manifestation of the police powers of the State. The case, as do all others in which the Wilson Act has been construed, relates to the power to *sell*, and not to the power to inspect. I have no criticism to make upon the extract from that opinion, particularly when taken in connection with the following extract from *Scott* v. *Donald*, 165 U. S. 58, also cited with apparent approval in the *Vandercook case:* "The question whether a given state law is a lawful exercise of the police power is still open, and must remain open, to this court. Such a law may forbid entirely the manufacture and sale of intoxicating liquors and be valid. Or, it may provide *equal* regulations for the inspection and sale of all domestic and imported liquors and be valid. But the State cannot, under the Congressional legislation referred to, establish a system which, in effect, discriminates between interstate and domestic commerce in commodities to make and use which are admitted to be lawful."

But we are not without authority upon this point. In *Minnesota* v. *Barber*, 136 U. S. 313, a law of Minnesota, as in this case, prohibited the sale of fresh meats except after an inspection, and was sought to be sustained as a law for the protection of the health of the inhabitants. The act required the inspection to take place within twenty-four hours before the animals were slaughtered, and was held to be void as a law intended to be applied only to cattle slaughtered outside the State. While the question was not discussed, it was as-

sumed that the meats had arrived at their destination within the State and been delivered to their consignee, and that the inspection, not being a *bona fide* one, was an unlawful discrimination against interstate commerce.  So in the subsequent case of *Brimmer* v. *Rebman*, 138 U. S. 78, a law of Virginia provided that meat should not be sold from animals slaughtered a hundred miles or more from the place where offered for sale, unless previously inspected by local inspectors.  The act was held to be void as in restraint of commerce between the States, and as imposing a tax upon the products of other States.  Both of these acts, as does the act of Missouri in question, provided against the sale of uninspected merchandise, and this court held, quite irrespective of other considerations, that the act was void.  To the same effect is *Walling* v. *Michigan*, 116 U. S. 446.

For the reasons already given, I think the act in this case is void as an inspection law, and an illegal interference with interstate commerce, since the assumed inspection preceded the arrival of the liquors within the State as a constituent part of its general property.

The consequences of this decision seem to me extremely serious.  If the States may, in the assumed exercise of police powers, enact inspection laws, which are not such in fact, and thereby indirectly impose a revenue tax on liquors, it is difficult to see any limit to this power of taxation, or why it may not be applied to any other articles brought within the State, and the cases of *Minnesota* v. *Barber*, 136 U. S. 313, and *Brimmer* v. *Rebman*, 138 U. S. 78, be practically overruled.  The Wilson Act does not give the legislature any greater authority with respect to the inspection of liquors than with respect to other imported articles, and, as already observed, it leaves the question of inspection exactly where it found it.  If the Wilson Act receive its natural application, that is, of meeting the exigency created by our decision in *Leisy* v. *Hardin*, and enabling the States to enforce their prohibitory liquor laws upon the arrival of the liquor within the State, as we have

repeatedly held, the law has a definite and distinct value and is readily understood.

I am authorized to state that the CHIEF JUSTICE, MR. JUSTICE BREWER and MR. JUSTICE DAY concur in this dissent.